UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DAMECHA HARRIS,

                              Petitioner,          **DECISION AND ORDER**

          -vs-                                     **No. 07-CV-6504(VEB)**

JAMES CONWAY, Superintendent,

                              Respondent.

## INTRODUCTION

Petitioner Damecha Harris ("Harris" or "petitioner"), proceeding *pro se*, has filed a

petition for a writ of habeas corpus challenging his conviction on November 23, 1998, in Erie

County Supreme Court. The parties have consented to disposition of this matter by a magistrate

judge pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The events giving rise to the conviction here at issue occurred on January 20, 1997, while

Harris was incarcerated in the Wende Correctional Facility, serving a sentence of fifteen years to

life following a conviction on charges of second degree robbery.  Harris, along with fellow

inmate Patrick Smith ("Smith"), instigated an assault on Correction Officer Stephen Gambino

("Gambino" or "the victim"), while Gambino was carrying out an order to frisk Harris' prison

cell at the facility. Harris originally was charged as both a principal and an accomplice for his

role in the assault.

According to Gambino, when he arrived at 9:30 a.m. to do the cell frisk, Harris was

asleep. Upon being informed of the cell frisk, Harris stated that "no motherfucking officer's

telling me what to do and before any officer tells me what to do, I'll kill you." T.53.[1] Gambino ignored Harris' display of temper and ordered him to get dressed, whereupon Harris again threatened to kill Gambino if he (Gambino) tried to search Harris' cell. T.55. Gambino told Harris that he had to leave the cell but that he could observe the cell frisk, provided that he calmed down and remained calm. T.56.

Harris exited the cell as ordered and took a position against the opposite wall so that he could watch Gambino conduct the cell frisk, *e.g.*, T.167-69, which revealed that Harris had several pairs of pants over the limit, six pack-up bags, and a broken mirror with a jagged edge–all items of contraband. T.58. While Gambino was searching the cell, Harris ranted that Gambino would be a "motherfucking dead man" if he took Harris' property. T.58. Gambino ordered petitioner, who was still yelling irately, to go to the shower room and lock himself in so that Gambino could exit the cell. Petitioner refused.  Correction Officer Doktor ("Doktor") responded to Gambino's call for assistance, but they were unable to force Harris to lock himself into the shower room. T.62, 63. At this point, the victim recalled that he told Doktor to summon Correction Officer Frederick Hogg ("Hogg").

Hogg came to the cell block area, and stood in Harris' cell door opening trying to talk Harris into locking himself into the shower. T.65, 66; *see also* T.173-74. This effort was unsuccessful, and Doktor recalled that Harris demanded to speak with a sergeant. T.174. Doktor went to his desk, called for a sergeant and, as he was returning to the cell block, saw Harris entering his cell. What occurred next can only be described as a melee.

Gambino recalled that while he as still inside the cell, petitioner rushed into the cell and

---

[1]     Citations to "T.___" refer to the trial transcript.

charged Hogg, knocking Hogg aside. Then, Harris began struggling with Gambino. Doktor testified on cross-examination that he did not see Hogg in the cell doorway when Harris entered and did not see Harris knock Hogg out of the way. T.186-88. Hogg testified that as he was approaching the cell block in response to Doktor's call for assistance, he saw petitioner standing outside the cell beside the radiator arguing with Gambino, who was inside the cell. T.201. Although Hogg could hear that they were yelling at each other, he could not hear what was being said. He did observe Harris pounding his fist into his hands in what Hogg perceived to be a threatening manner. T.203. Hogg testified that as he approached, he saw petitioner push Gambino into the cell. Hogg was about to enter the cell when he observed inmate Smith coming toward him. Hogg was grabbed by another unidentified inmate, giving Smith the opportunity to enter the petitioner's cell. T.204.

Gambino testified that when petitioner entered the cell, he grabbed Gambino in his upper body area, and a struggle ensued. T.66. Petitioner, who apparently was restrained to some extent by Gambino, eventually managed to free one of his arms and punched Gambino several times in the face, head, neck and shoulder area. T.66-67. Gambino testified that at some point, petitioner fell on top of his bunk, and Gambino fell on top of him. Meanwhile, Gambino recalled, Smith was hitting Gambino in the back of the head and the neck area. T.68. By the time Hogg arrived, he observed Gambino on the bed wrestling with petitioner; Smith was on top of Gambino moving his clenched fist "in an up and down motion" toward the victim's head area. T.206.

Correction Officer William Sandor ("Sandor") then arrived at the cell in response to the level 2 alarm sounded by Doktor. Sandor saw Smith run into the cell and begin hitting Gambino with a closed fist in the back of the head. T.245. Gambino was on top of petitioner who was

face-up on the bunk. T.245, 248. Sandor entered the cell and removed co-defendant Smith. When Correction Officers McGough and Higley arrived to provide further assistance, McGough recalled petitioner and the victim were wrestling inside petitioner's cell. McGough assisted Sandor in restraining petitioner and also assisted in removing him from the scene. T.70, 72-73, 157-59.

With regard to the injuries suffered by Gambino during the assault, Sandor and Doktor recalled that when Gambino came out of the cell, he "was hurting." After the altercation Gambino's face neck area appeared red and he complained of neck pain. *See* T.181, 231-32, 249, 257.

Dr. Federick McAdam testified that he had first diagnosed Gambino with cervical disk pain on January 22, 1996. T.280-81. Gambino underwent pain control therapy in 1996; this culminated in the administration of two epidural steroid injections in April and May of 1996 which reportedly improved his condition. T.282. When McAdam saw Gambino in September 1996, Gambino's range of motion in his neck was limited by fifty percent. T.283-84.

McAdam next saw Gambino on January 28, 1997, about a week after the altercation with petitioner. At that time, Dr. McAdam determined that Gambino had a seventy-five-percent limitation in his neck range of motion and diagnosed him as being temporarily totally disabled. T.286. Dr. McAdam testified that prior to the incident, Gambino always had been able to work, notwithstanding his neck condition. Dr. McAdam opined that something happened between September 1996 and January 1997 which caused further injury to the victim's neck. T.289.  Dr. McAdam administered another epidural steroid injection on February 8, 1997, and kept him out of work until April 1, 1997. T.285, 288. Dr. McAdam indicated that Gambino's disk problem

-4-

could "flare up" or be exacerbated by, for instance, Gambino receiving a punch in the back of the neck or being involved in a bout of wrestling or a fight. T.308.

Following a jury trial, Harris was convicted of one count of assault in the second degree, as charged in the indictment, as well as the lesser included offense of assault in the third degree. Harris was sentenced as a persistent violent felony offender to concurrent terms of imprisonment of 15 years to life on the second degree assault conviction and one year on the other conviction. The sentences for the assault on Gambino were to be served consecutively to any undischarged term of imprisonment that Harris was serving. Harris' conviction was unanimously affirmed and leave to appeal further was denied.

In this federal habeas petition, Harris asserts that trial counsel was ineffective, that the prosecutor knowingly allowed a witness to perjure himself on the stand, and that there was legally insufficient evidence to support his conviction. *See* Petition ("Pet.") at 7-8 & Addendum to p. 8 (Dkt #1). Respondent answered the petition, interposing the defense of non-exhaustion with regard to all of Harris' claims. *See* Respondent's Memorandum of Law ("Resp't Mem.") at (Dkt. #9). In response, Harris filed a motion seeking to have his petition stayed and held in abeyance while he returned to exhaust state court remedies with regard to the claims that respondent contends are unexhausted. *See* Petitioner's Motion for a Stay ("Pet'r Stay Mot.") (Dkt. ## 14 & 16).

For the reasons that follow, I find that not only are the claims at issue plainly without merit,  none of the claims raised by Harris in his petition warrant habeas relief under any standard of review. Harris has also failed to allege "good cause" for his failure to exhaust the claims before filing his petition in federal court, and no good cause is apparent on the record

before me. Indeed, it is obvious that petitioner's stay motion was only made after respondent

filed his answer raising the defense of non-exhaustion. I find that it would be an abuse of

discretion to grant a stay of this habeas proceeding to allow Harris to return to state court to

institute exhaustion proceedings. *See Rhines v. Weber*, 544 U.S. 269, 277-78 (2005).[2]  Harris'

motion for a stay therefore is denied with prejudice. Furthermore, Harris' request for a writ of

habeas corpus is denied and the petition is dismissed.[3]

## MERITS OF THE PETITION

### Grounds One, Two and Three: Ineffective Assistance of Trial Counsel

A defendant's Sixth Amendment right to the effective assistance of counsel at trial is

violated when "counsel's conduct so undermined the proper functioning of the adversarial

process that the trial cannot be relied on as having produced a just result." *Strickland v.

Washington*, 466 U.S. 668, 686 (1984). To prevail on an ineffectiveness claim, a defendant must

show that his attorney's performance fell "below an objective standard of reasonableness" and

that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." *Id.* at 694. A "reasonable probability" is a

"probability sufficient to undermine confidence in the outcome." *Id.*  Thus, "the question is

whether there is a reasonable probability that, absent the errors, the fact finder would have had a

reasonable doubt respecting guilt." *Id.* at 695.

---

[2]     The Supreme Court stated in *Rhines* that "it likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had [1] good cause for his failure to exhaust, [2] his unexhausted claims are potentially meritorious, and [3] there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." 544 U.S. at 278. On the other hand, the Supreme Court explained, even if a petitioner had "good cause" for the failure to exhaust the claims first, it would be an abuse of discretion to grant a stay when the claims are "plainly meritless." *Id.* at 277 (citing 28 U.S.C. § 2254(b)(2)).

[3]     I decline to examine whether the claims are or are not exhausted and proceed to deny the petition on the merits pursuant to the authority vested in the federal courts pursuant to 28 U.S.C. § 2254(b)(2).

-6-

Harris' first, second, and thirds grounds for relief in the petition assert that he was denied his Sixth Amendment right to the effective assistance of counsel at his trial. In particular, Harris complains of the following alleged errors by trial counsel: (1) failure to retain a medical expert; (2) failure to call witnesses and introduce certain reports; (3) failure to conduct unspecified pre-trial hearings; (4) failure to object to the introduction of the victim's pre-incident medical records; (5) failure to verify that the victim sought treatment after the altercation and obtain copies of the victim's treatment records from the prison infirmary. None of these purported errors, taken singly or together, establish that Harris was deprived of the level of representation to which he was constitutionally entitled.

### 1. *Failure to Consult with a Medical Expert*

Under Ground One, Harris states that the "worst" error by trial counsel was the "failure to conduct an adequate pre-trial investigation into critical medical evidence . . . ." Pet. at 7, ¶22(A) (Dkt #1). Harris states that if counsel had "consulted a medical expert, she would of [sic] 'likely have presented expert testimony rebutting the prosecution's medical expert.'" *Id.* Harris does not indicate the source from which he quoted the foregoing statement, and provides no other details in regard to this claim.

Harris provides no support for his contention there was, in fact, an expert witness who potentially would have been willing to examine the victim and testify for the defense in rebuttal to the prosecution's expert. Indeed, Harris can only speculate that such a witness even exists. Harris has not identified the "critical medical evidence" that trial counsel allegedly ignored. Nor has he demonstrated any prejudice whatever. Indeed, he cannot do so in light of his failure to provide any specifics at all regarding the entirely hypothetical verdict-altering expert testimony.

### 2. *Failure to Call a Witness to Demonstrate Perjury by Other Correction Officers*

Harris contends that trial counsel should have called Investigator Randall Innis ("Innis") as a witness "to testify where both corrections officers, both prejured [sic] themselves during the initial investigation, all counsel had to do was introduce those records into evidence . . . ." Pet. at 8, ¶22A (Dkt #1). In the context of a direct appeal of a criminal conviction, the Second Circuit has held that in order to grant a new trial based on newly discovered evidence of trial perjury, the defendant "must first demonstrate that the witness in fact committed perjury." *United States v. Monteleone*, 257 F.3d 210 (2d Cir. 2001) (citing *United States v. Torres*, 128 F.3d 38, 49 (2d Cir.1997)), *cert. denied*, 122 S. Ct. 1946 (2002). "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, *as distinguished from* incorrect testimony resulting from confusion, mistake, or faulty memory." *Id.* (citing *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (emphasis added)). Even in a case where perjury "clearly has been identified," the Second Circuit has repeatedly "indicated [its] reluctance to approve the granting of a new trial unless [it] can say that the jury probably would have acquitted in the absence of the false testimony." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992).

As respondent explains, Harris is referring to merely an apparent inconsistency between the testimony by the victim, Gambino, and Hogg, one of the witnesses, regarding as to how petitioner entered the cell prior to the assault. The reports to which Harris is referring are of the post-incident interview of Hogg conducted by Innis. Gambino recalled that Hogg was standing inside the opening of the cell when he was pushed aside by petitioner, who then entered the cell and attacked him (Gambino). Hogg, on the other hand, testified that as he was responding to the

alarm, he observed petitioner run at Gambino and push him inside the cell before co-defendant Smith entered the cell. This testimony was consistent with what Hogg had told Innis in his witness statement after the incident.

Harris contends that this variance between Hogg's and the victim's recollections establishes that the victim perjured himself. This claim is frivolous. First, the alleged concerns a matter of only peripheral import–the manner in which Harris entered the cell before attacking was not material to the jury's finding of guilt. More important, Harris has identified, at most, out a minor discrepancy in Hogg's and Gambino's version of the event witnessed by these officers during the confusion of a violent scuffle created by Harris' and Smith's own actions. The law is clear that this is insufficient: "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *Monteleone*, 257 F.3d at 219 (citing *United States v. Sanchez*, 969 F.2d at 1414-15). Harris has not established that either witness testified untruthfully. There is nothing whatsoever in the record before me in this case to indicate that the prosecutor knowingly used false testimony to convict Harris. Accordingly, this claim must be dismissed.

### 3. *Failure to Conduct Pre-Trial Hearings*

As his next complaint about trial counsel's performance, Harris states that his attorney failed "to conduct any pretrial hearing [sic], and went right to trial . . . ." Pet. at 8, ¶22C (Dkt. #1). This claim is fatally defective because Harris fails to identify which hearings counsel neglected to request. As respondent points out, identification was not an issue, no evidence was seized, and no statements were made by petitioner. Furthermore, the claim is belied by the

record, which shows that defense counsel requested and received a *Sandoval* hearing[4] regarding

the prosecution's ability to cross-examine Harris about prior bad acts in the event he were to take

the stand.  This claim is patently without merit and must be dismissed.

### 4.  *Failure to Object to the Prosecutor's Introduction of the Victim's Previous Medical Records*

Harris faults trial counsel for "allowing the prosecution to submit into evidence . . .

corrections officer [sic] old medical records from 1996 . . . ." Pet. at 8, ¶22C (Dkt. #1).  That is

the extent of Harris' allegations with regard to this issue. Harris is apparently referring to a "pain

diagram" from the victim's medical charts from 1996. However, as respondent points out, trial

counsel strategically used this record (but did not move to have it received into evidence) when

cross-examining the victim. Thus, Harris' claim is factually unfounded to the extent that he

complains that defense counsel failed to object.  Furthermore, defense counsel was not

deficient–rather, he used the diagram as part of the overall defense strategy. Counsel cross-

examined the victim using the pain diagram in an attempt to make the jury aware that Gambino

had a pre-existing back injury and persuade them that the victim had been suffering from neck

pain *prior* to his altercation with petitioner and, consequently, petitioner was not responsible for

the injuries of which the victim allegedly complained following the incident. Again, this claims

is patently without merit and must be dismissed.

### 5.  *Failure to Investigate the Victim's Post-Incident Medical Treatment*

Harris faults trial counsel for failing to "verify that the victim sought treatment

---

[4]     The purpose of a hearing pursuant to *People v. Sandoval*, 34 N.Y.2d 371 (1974), is to provide an advance ruling on the prosecutor's ability to use a defendant's prior criminal acts as grounds for impeachment during cross-examination.

immediately after the incident" and failing "to obtain copies of the reports for the alleged victim [sic] 'treatment' or 'examination' at the facility's infirmary, after the alleged incident." Pet. at 8, ¶22C. The victim testified consistently that he visited the facility's hospital after the altercation, filled out an incident report there, and was given Tylenol for his neck pain. T.84, 86, 123. Harris has not come forward with any evidence that the victim did *not* seek medical treatment at the prison infirmary–in other words, he has not shown that further investigation would have led to evidence by which counsel potentially could have discredited the victim's testimony. Harris therefore cannot possibly establish how he was prejudiced by this alleged shortcoming on trial counsel's part.

### Ground Four: Perjury

As his fourth ground for habeas relief, Harris asserts that the prosecutor "entered perjured testimony knowingly and intentionally . . . ." Pet. at 8, ¶22D (Dkt. #1).  Harris, however, utterly fails to identify which witness or witnesses allegedly lied on the stand or what issue or issues the allegedly untruthful testimony concerned. This claim is entirely too vague to begin to state a colorable claim for relief. It is dismissed.

### Ground Five: Legal Insufficiency of the Verdict and Repugnant Verdicts

As his final ground for relief, Harris states "co-defendant, Patrick Smith, . . . was convicted, while [petitioner] was found guilty, given the same evidence, in a jury trial, the evidence adduced at a non-jury trial was legally insufficient to find [his] co-defendant not guilty of aiding and abetting, while [he] was found guilty, for aiding and abetting . . . ." Addendum to p. 8 of Pet. (Dkt. #1).

The indictment against petitioner Harris and co-defendant Smith charged them both as

principals and as accomplices, *see* N.Y. Penal Law § 20.00,[5] with regard to count one and count

two of the indictment. Harris opted to have a jury trial while co-defendant Smith, however,

elected to have a bench trial. Their trials were conducted before the same judge. The jury found

Harris guilty of count one (N.Y. Penal Law § 120.05(3)), which alleged that he and Smith

> each being intentionally aided by the other, on or about the 20th day of January
> 1997, in this County, with intent to prevent a peace officer from performing a
> lawful duty, caused physical injury to Correction Officer Stephen Gambino, [at]
> Wende Correctional Facility, by punching him.

People's Appellate Brief at 15-16, Resp't Ex. B. The jury was instructed to consider the evidence

only as it pertained to Harris, as the judge was the trier-of-fact with respect to co-defendant

Smith. The jury acquitted Harris of count two (N.Y. Penal Law § 120.05(7)) of the indictment,

which alleged that he and Smith intentionally punched the victim in order cause him physical

injury. Instead, the jury found Harris guilty of the lesser included offence of assault in the third

degree (N.Y. Penal Law § 120.00(2))–that is, "recklessly caus[ing] physical injury to another

person."  The trial judge, after hearing the same proof, acquitted co-defendant Smith of all

charges. Harris, understandably, was upset by this turn of events.

   Harris' claim that the verdict convicting him and the verdict acquitting his co-defendant

are repugnant or inconsistent is not cognizable in this federal habeas proceeding. *See Harris v.*

*Rivera*, 454 U.S. 339, 344 (1981) ("In view of the limited scope of review of a state judgment

authorized in a federal habeas corpus proceeding, it is plain that the Court of Appeals erred in

this case. On the assumption that the Court of Appeals correctly determined that the verdicts

---

[5]     Penal Law § 20.00 sets forth the provision regarding accomplice liability, and provides that
"[w]hen one person engages in conduct which constitutes and offense, another person is criminally liable for such
conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests,
commands, importunes, or intentionally aids such person to engage in such conduct." N.Y. PENAL LAW § 20.00.

[rendered after a bench trial] are facially inconsistent, we hold that there is no federal requirement that a state trial judge explain his reasons for acquitting a defendant in a state criminal trial; even if the acquittal rests on an improper ground, that error would not create a constitutional defect in a guilty verdict that is supported by sufficient evidence and is the product of a fair trial."). The Supreme Court in *Harris v. Rivera,* a case not involving this petitioner by the same name, reiterated that "[i]nconsistency in a verdict is not a sufficient reason for setting it aside." *Id.* (citing *Dunn v. United States*, 284 U.S. 390 (1932) (so holding respect to inconsistency between verdicts on separate charges against one defendant); *United States v. Dotterweich*, 320 U.S. 277, 279 (1943) (so holding with respect to verdicts that treat codefendants in a joint trial inconsistently).

In other words, even if I assume that acquitting co-defendant Smith was logically inconsistent with the jury's conviction of petitioner, this does not provide a basis for habeas relief, as petitioner "was found guilty beyond a reasonable doubt after a fair trial, [and] has no constitutional ground to complain that [his- co-defendant] was acquitted." *Harris*, 454 U.S. at 348 (footnote omitted).

Related to his claim of repugnant verdicts is Harris's claim that the evidence was legally inconsistent to convict him. A court's inquiry in reviewing a legal insufficient claim is limited to asking whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *accord*, *e.g*, *People v. Contes*, 60 N.Y.2d 620, 621 467 N.Y.S.2d 349, 349-350 (1983). Under the *Jackson* standard, "the assessment of the credibility of witnesses is generally beyond the scope of

review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995); *accord Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on [habeas] appeal."). In this case, the jury's decision primarily was a matter of choosing whether to believe the prosecution witnesses' version of events or to believe the version offered by the defense. *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir.1981). As respondent points out, the jury heard testimony that Harris charged into the cell where Gambino was conducting a frisk, after verbally threatening Gambino and refusing to obey orders to go lock himself in the shower room. The jury heard that Harris grabbed Gambino and, during the struggle that followed, punched Gambino in the face, head, neck and shoulders. I cannot say that on all the evidence presented *no* rational jury could have found Harris guilty beyond a reasonable doubt of all of the elements of second degree assault (causing physical injury with the intent to prevent a peace officer from performing a lawful duty). I note that apart from the logical inconsistencies present in this case regarding the inconsistent verdicts, Harris focuses solely on the alleged inconsistencies discussed above between Gambino's recollection and Hogg's testimony. Those arguments go to the jury's assessment of the credibility of Gambino, which was an issue properly resolved by the jury, and not reviewable by this Court on habeas review. *See Carromero v. Strack*, No. 98 Civ. 3519(LAP), 1998 WL 849321, at *5 (S.D.N.Y. Nov. 19, 1998) (evidence sufficient where jury credited prosecution witnesses' testimony "despite some inconsistencies between their trial testimony and prior statements to the police and to the grand jury" ); *Taxiarhopoulos v. Spence*, No. CV 92-0790(RR), 1992 WL 403112, at *4 (E.D.N.Y. Dec. 28, 1992) (The petitioner "cannot show that the evidence was insufficient to support conviction. For example, he challenges the credibility of the main

prosecution witness . . ., pointing to alleged inconsistencies in his testimony. This, however, was an argument made to, and properly resolved by, the trial jury." ). Petitioner's fifth ground for relief is without merit.

## CONCLUSION

For the reasons stated above, Damecha Harris' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition (Dkt. #1) is dismissed. Harris' motion for a stay of the petition (Dkt. ##14 & 16) are dismissed with prejudice. Because Harris has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:     April 8, 2008
           Rochester, New York.